UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| CONCEPTS NREC, LLC | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:23-cv-612 |
| | ) | |
| SPINPO LLC, MENGMENG ZHANG, AND | ) | |
| DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

COMPLAINT FOR BREACH OF CONTRACT, COPYRIGHT INFRINGEMENT,
MISAPPROPRIATION OF TRADE SECRETS, UNJUST ENRICHMENT, VIOLATION OF
VERMONT'S CONSUMER PROTECTION ACT, TORTIOUS INTERFERENCE WITH
BUSINESS RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE,
CONSTRUCTIVE FRAUD AND CIVIL CONSPIRACY

Plaintiff Concepts NREC, LLC ("Concepts"), by its attorneys, for its complaint against

Defendants Spinpo LLC ("Spinpo"), Mengmeng Zhang ("Zhang") and Does 1-10 hereby

demands a jury trial and alleges as follows:

THE PARTIES

1.      Plaintiff, Concepts is a Delaware limited liability corporation with its principal

place of business located at 217 Billings Farm Rd., White River Junction, VT, 05001.

2.      Defendant Spinpo is a California limited liability software sales company with a

principal address at 506 S. Spring Street #13308, Los Angeles, California 90013.

3.      Defendant Mengmeng Zhang is the manager of Spinpo and an individual with an

address at 506 S. Spring Street #13308, Los Angeles, California 90013.

4.      Defendants Does 1-10 are one or more members or owners of Spinpo, whose

identity is unknown to Plaintiff at this time.

5.     Non-party, TurboTides, Inc. is or was a for profit New Hampshire corporation with an office in New Hampshire and the Luyang District of Hefei, China and is or was doing business internationally under the names "TurboTides" and Hefei Taize Turbomachinery Company Ltd. ("Hefei Taize").

6.     Non-party Hefei Taize is a Chinese company with offices and doing business in the Luyang District of Hefei, China and the United States and is and was doing business internationally under the name "TurboTides."

7.     Non-party Xuwen Qiu is the principal stockholder, founder, President and Director of TurboTides, Inc. and is also the founder, controlling owner and principal corporate officer and a Director of Hefei Taize.

8.     Upon information and belief, Spinpo, Zhang, Does 1-10, TurboTides, Inc., Mr. Qiu and Hefei (collectively, "The TurboTides Entities") all share the same offices in Hefei, China and their various employees and agents work for the collective benefit of a single enterprise offering the same products and services to the same customers world-wide.

9.     On information and belief, The TurboTides Entities are controlled by or at the direction of Qiu as a single enterprise who owns a major and/or controlling interest in all entities.

10.    On information and belief, The TurboTides Entities are alter egos of each other and also are so organized and controlled, and their affairs are so conducted as to make them merely an instrument, agent, conduit, or adjunct of a single enterprise.

11.    There is such a unity of interest and ownership between The TurboTides Entities that the separate personalities of the individual entities no longer exist, or are merged, so that each entity is a mere adjunct of the other or the entities form a single enterprise.

2

12. Inequitable results will follow if any corporate separateness is respected among The TurboTides Entities, and the acts in question are treated as those of one individual entity alone.

## SUBJECT MATTER AND PERSONAL JURISDICTION, AND VENUE

13. This Court has subject matter jurisdiction under (a) 28 U.S.C. § 1331, as this action arises out of the laws of the United States; (b) 28 U.S.C. § 1332(a), as this action is between parties that are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs; (c) 28 U.S.C. § 1338(a), as this action arises under an Act of Congress relating to copyrights; and (d) 28 U.S.C. § 1367(a), as this action involves state law claims that arise out of the same case or controversy as the federal claims.

14. This Court has personal jurisdiction over Defendants in this action, and venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)-(c), because (a) Qiu, who is a member of The TurboTides Entities' single enterprise contractually agreed that the venue for litigation concerning the subject matter of the Plaintiff's breach of contract claim is Vermont; (b) Defendants Spinpo, Zhang and Does 1-10 performed acts specifically directed towards Concepts in this forum that have caused and continue to cause Concepts the harms alleged herein; (c) a substantial part of the conduct giving rise to Concepts' asserted claims has had effects in this judicial district; and (d) a substantial part of Concepts' intellectual property that is the subject of this action is situated in this judicial district.

## FACTS

### Spinpo

15. Defendants filed articles of incorporation for Spinpo on April 21, 2023.

3

16.     On or about June 20, 2023, TurboTides, Inc. purported to terminate its relationship with Hefei and ceased selling, licensing and/or offering for license or sale, the TurboTides software; and Spinpo undertook TurboTides, Inc.'s role in selling, licensing and/or offering for license or sale, the TurboTides Software.

17.     Upon information and belief, at the time Spinpo undertook to sell, license and/or offer for sale or license the TurboTides Software in lieu of TurboTides, Inc., the assets previously used by TurboTides, Inc. to license or sell the TurboTides software were transferred to Spinpo. Upon information and belief, that transfer of assets was for zero consideration.

18.     Upon information and belief, at the time Spinpo undertook to sell, license and/or offer for sale or license the TurboTides software, the employees previously used by TurboTides, Inc. to license or sell the TurboTides software ceased their employment with TurboTides, Inc. and commenced working for Spinpo.

19.     Upon information and belief, at the time Spinpo undertook to sell, license and/or offer for sale or license the TurboTides software, the books and records, customer records, customer information, prospective customer information, and licenses to operate the TurboTides Software previously used by TurboTides, Inc. to run its business were transferred to Spinpo. Upon information and belief, that transfer was for zero consideration.

20.     Upon information and belief, other than a name change, there is no difference between Spinpo and TurboTides, Inc.

21.     Upon information and belief, at the time Defendants filed articles of incorporation for Spinpo, Defendants were aware of the existence of and claims asserted by Concepts in its lawsuit against Xuwen Qiu, TurboTides, Inc. and HongYing Zhang and Concepts' claims for

4

sanctions against Hefei Taize in Case No. 5:20-cv-133 pending before this Court in the District of Vermont.

22.     Upon information and belief, at the time Defendants filed articles of incorporation for Spinpo, they were aware of this Court's rulings that Hefei Taize and TurboTides, Inc. were alter egos of each other.

23.     Upon information and belief, at the time Defendants filed articles of incorporation for Spinpo, they were aware that Xuwen Qiu and his wife Hongying Zhang planned to and/or were selling their home and the corporate headquarters of TurboTides, Inc. at 21 Pinneo Road, Hanover, New Hampshire.

24.     Upon information and belief, at the time Defendants filed articles of incorporation for Spinpo, they were aware that Hefei Taize and the defendants in Case No. 5:20-cv-133 were exposed to significant liability as a result of that long pending litigation.

25.     Upon information and belief, Defendants and the other TurboTides Entities coordinated with each other for the purpose of attempting to hide or shield the defendants, Hefei Taize and/or their assets from the significant liability in Case No. 5:20-cv-133 that they face as a result of that long pending litigation.

26.     Upon information and belief, given the significant liability exposure of the defendants in Case No. 5:20-cv-133, no sensible independent investor or entity would expose itself to the type of liability alleged against defendants in Case No. 5:20-cv-133.

27.     Upon information and belief, the Defendants' creation and existence was orchestrated and arranged by them and the other TurboTides Entities for the purpose of defrauding Concepts and the District of Vermont Court.

5

The Concepts Software Trade Secrets and Concepts Copyrighted Trade Secrets

28.    Concepts' Agile Engineering Design System® is a complementary suite of programs that delivers proprietary Computer-Aided Engineering (CAE) and Computer-Aided Manufacturing (CAM) software (collectively, the "Concepts Software") for turbomachinery. The Concepts Software covers the entire turbomachinery design process from preliminary sizing through final design, with full fluid dynamics, mechanical stress, and vibration analysis. Concepts licenses the Concepts Software for a fee to users around the world.

29.    The Concepts Software includes copyrightable subject matter under 17 U.S.C. § 101, et seq. (the "Copyright Act").

30.    Concepts is the owner of numerous copyright registrations "Concepts' Copyrights" for the Concepts Software, including the following:

> a.  U.S. Copyright Registration No. TX 5-129-770, registered on August 23, 2000, and entitled "CCAD 7.0.1" (the "Concepts0 Copyright") is owned by Concepts. A true and correct copy of the Concepts0 Copyright Registration is attached hereto as Exhibit A.
>
> b.  U.S. Copyright Registration No. U.S. Copyright Registration No. TX 5-129-768, registered on August 23, 2000, and entitled "CCAD 7.1.19" (the "Concepts1 Copyright") is owned by Concepts.  A true and correct copy of the Concepts1 Copyright Registration is attached hereto as Exhibit B.
>
> c.  U.S. Copyright Registration No. TX 5-129-769, registered on August 23, 2000, and entitled "CCAD 7.2.20" (the "Concepts2 Copyright") is owned by Concepts. A true and correct copy of the Concepts2 Copyright Registration is attached hereto as Exhibit C.

6

d.  U.S. Copyright Registration No. TX 5-245-124, registered on January 12, 2001, and entitled "CCAD 7.3.17 and User's Guide to CCAD, Version 7.3" (the "Concepts3 Copyright") is owned by Concepts.  A true and correct copy of the Concepts3 Copyright Registration is attached hereto as <u>Exhibit D</u>.

e.  U.S. Copyright Registration No. TX 8-767-252, first published in 2004, registered on July 12, 2019, and entitled CCAD 7.7 (the "Concepts4 Copyright") is owned by Concepts. A true and correct copy of the Concepts4 Copyright Registration is attached hereto as <u>Exhibit E.</u>

f.  U.S. Copyright Registration No. TX 8-767-258, first published 2005, registered on July 12, 2019, and entitled AxCent 7.8 (the "Concepts5 Copyright") is owned by Concepts.  A true and correct copy of the Concepts5 Copyright Registration is attached hereto as <u>Exhibit F.</u>

g.  U.S. Copyright Registration No. TX 8-767-259, first published in 2006, registered on July 12, 2019, and entitled AxCent 7.9 (the "Concepts6 Copyright") is owned by Concepts.  A true and correct copy of the Concepts6 Copyright Registration is attached hereto as <u>Exhibit G</u>.

h.  U.S. Copyright Registration No. TX 8-767-260, first published in 2007, registered on July 12, 2019, and entitled AxCent 7.10 (the "Concepts7 Copyright") is owned by Concepts.  A true and correct copy of the Concepts7 Copyright Registration is attached hereto as <u>Exhibit H</u>.

i.  U.S. Copyright Registration No. TX 8-767-261, first published in 2008, registered on July 12, 2019, and entitled AxCent 7.11 (the "Concepts8 Copyright") is owned

7

by Concepts. A true and correct copy of the Concepts8 Copyright Registration is attached hereto as Exhibit I.

j. U.S. Copyright Registration No. TX 8-767-265, first published in 2009, registered on July 12, 2019, and entitled AxCent 7.12 (the "Concepts9 Copyright") is owned by Concepts. A true and correct copy of the Concepts9 Copyright Registration is attached hereto as Exhibit J.

k. U.S. Copyright Registration No. TX-8-767-263, first published in 2010, registered on July 12, 2019, and entitled AxCent 7.13 (the "Concepts10 Copyright") is owned by Concepts. A true and correct copy of the Concepts11 Copyright Registration is attached hereto as Exhibit K.

l. U.S. Copyright Registration No. TX 8-767-257, first published in 2011, registered on July 12, 2019, and entitled AxCent 8.0 (the "Concepts11 Copyright") is owned by Concepts. A true and correct copy of the Concepts10 Copyright Registration is attached hereto as Exhibit L.

m. U.S. Copyright Registration No. TX 8-767-255, first published in 2012, registered on July 12, 2019, and entitled AxCent 8.1 (the "Concepts12 Copyright") is owned by Concepts. A true and correct copy of the Concepts12 Copyright Registration is attached hereto as Exhibit M.

n. U.S. Copyright Registration No. TX 8-767-001, first published in 2013, registered on July 12, 2019, and entitled AxCent 8.2 (the "Concepts13 Copyright") is owned by Concepts. A true and correct copy of the Concepts13 Copyright Registration is attached hereto as Exhibit N.

8

o.  U.S. Copyright Registration No. TX 8-767-270, first published in 2014, registered on July 12, 2019, and entitled AxCent 8.3 (the "Concepts14 Copyright") is owned by Concepts.  A true and correct copy of the Concepts14 Copyright Registration is attached hereto as <u>Exhibit O</u>.

p.  U.S. Copyright Registration No. TX 8-768-081, first published in 2015, registered on July 12, 2019, and entitled AxCent 8.4 (the "Concepts15 Copyright") is owned by Concepts.  A true and correct copy of the Concepts15 Copyright Registration is attached hereto as <u>Exhibit P</u>.

q.  U.S. Copyright Registration No. TX 8-768-084, first published in 2016, registered on July 12, 2019, and entitled AxCent 8.5 (the "Concepts16 Copyright") is owned by Concepts.  A true and correct copy of the Concepts16 Copyright Registration is attached hereto as <u>Exhibit Q</u>.

r.  U.S. Copyright Registration No. TX 8-768-082, first published in 2017, registered on July 12, 2019, and entitled AxCent 8.6 (the "Concepts17 Copyright") is owned by Concepts.  A true and correct copy of the Concepts17 Copyright Registration is attached hereto as <u>Exhibit R</u>.

s.  U.S. Copyright Registration No. TX 8-768-087, first published in 2018, registered on July 12, 2019, and entitled AxCent 8.7 (the "Concepts18 Copyright") is owned by Concepts.  A true and correct copy of the Concepts18 Copyright Registration is attached hereto as <u>Exhibit S</u>.

31.    Concepts is the owner of all right, title and interest in and to the copyrights in the Concepts Software.

32.     The Concepts Software contains information, designs, and processes (collectively "Concepts Software Trade Secrets") that derive independent economic value from not being generally known to or readily available by proper means to unauthorized users of Concepts Software.

33.     The Concepts Software contains copyrighted code (collectively "Concepts Copyrighted Trade Secrets") that derives independent economic value from not being generally known to or readily available by proper means to anyone other than persons who agree to confidentiality agreements with Concepts.

34.     Concepts and its predecessors in interest identified the Concepts Copyrighted Trade Secrets as trade secrets at the time of registration and, in doing so, deposited with the U.S. Copyright Office only one copy of no more than the first fifty pages and last fifty pages of the code, blocking none of that code.  The combined first and last fifty pages of the code comprise an approximate one ten thousandth (1/10,000) portion of the code.  By this means and not publicly disclosing the remaining approximate nine thousand, nine hundred and ninety nine ten thousandth (9,999/10,000) portion of the code, the confidentiality of the Concepts Copyrighted Trade Secrets in the Concepts Software was preserved.

35.     In addition to identifying and preserving the Concepts Copyrighted Trade Secrets during the copyright registration process, additional reasonable efforts were and are undertaken by Concepts and its predecessors in interest to maintain the secrecy of the Concepts Software Trade Secrets in the Concepts Software by limiting access outside of Concepts only to third-parties who agree to the Concepts Software Terms and Conditions.  A copy of the Concepts Software Terms and Conditions is attached as Exhibit T.

36.     To access the Concepts Software, a user must, "click through" and accept the Concepts Software Terms and Conditions.

### The Concepts Non-Software Trade Secrets

37.     In addition to the Concepts Software Trade Secrets and the Concepts Copyrighted Trade Secrets, Concepts maintains confidential information about its business, its customers, its potential customers, its pricing models, its long term objectives, its operations, and its pricing (the "Non-Software Concepts Trade Secrets") that derive independent economic value from not being known to or readily available persons other than persons who work for Concepts.

38.     Reasonable efforts are undertaken by Concepts to maintain the secrecy of the Concepts Non-Software Trade Secrets by limiting access only to employees who sign and agree to the terms of employment agreements designed to keep confidential and protect those Non-Software Trade Secrets from dissemination, disclosure and use to and by non-Concepts employees.

39.     The Concepts Software Code, Software Trade Secrets and Non-Software Trade Secrets were developed by Concepts over decades and at the cost and investment in excess of $63,800,000.

### Qiu's Employment By Concepts ETI And Concurrent Creation of TurboTides and Hefei Taize

40.     Qiu was employed by Concepts ETI, Inc. (a/k/a "CETI") for more than fourteen years during the period July 2, 2001 to December 7, 2015.  Concepts ETI, Inc. was merged into CN Holdings, Inc. ("CN Holdings").  Employees of CN Holdings and former employees of CETI, including Defendant Qiu, work for and at Concepts.  CN Holdings owns Concepts and, as the former employer of Qiu, assigned to Concepts its contracts with Qiu and all rights it has as Qiu's employer.

11

41.     When Qiu was first employed by CETI he was a young engineer with little experience in or knowledge about the turbomachinery business and had no knowledge of or access to Concepts Copyrighted Trade Secrets, Concepts Non-Software Trade Secrets or Concepts Software Trade Secrets.

42.     Over the fourteen years he was employed by CETI and as he was promoted and given more responsibility, Qiu became privy to Concepts' confidential methods of doing business, business plans and objectives, pricing, operational considerations, competition and means of meeting competition, customers and potential customers.  This confidential information included Concepts Copyrighted Trade Secrets, Concepts Non-Software Trade Secrets and Concepts Software Trade Secrets.

43.     Over the course of his employment, Mr. Qiu conceived of, created, authored, edited, revised and over saw employees who conceived of, created, authored, edited and revised Concepts' Software.  Mr. Qiu's last held title while at Concepts was "Director of Corporate Technology" and in that capacity he was responsible for the overall development of multiple Concepts software products, selection and implementation of new features, and providing marketing information to the sales team for these new offerings. These responsibilities often involved development of new meanline models for various turbomachinery components.

44.     In 2001, as a condition and in consideration of his employment by CETI, Mr. Qiu executed an Employee Confidentiality and Nondisclosure Agreement (the "Employment Agreement").  A copy of the Employment Agreement between CETI and Mr. Qiu is attached as Exhibit U.  CETI's rights in the Employment Agreement have been assigned to Concepts.

45.     While visiting his family in China in or about early 2009, Mr. Qiu reconnected with former classmates – Mr. Yu Qing and Mr. Pinhua Xie - from his school in China and told

12

them in an email dated February 24, 2009 that he was "exploring the possibility of registering a company in China."

46.     On March 1, 2010, Pinhua Xie suggested to Mr. Qiu that he should discuss how to build an industrial base in China. Mr. Qiu responded "[h]opefully in a few years, I will be able to join you guys and develop something inside China."

47.     On September 5, 2010, Mr. Qiu sent an email to Yu Qing stating "I will return to China on business next month 9th, and I expect to be in Hefei around the 20th. During my stay in Hefei, I will meet with a potential investor to discuss the possibility of opening a company in Hefei. I'd also like to share some of my thoughts on this with you." Mr. Qing responded, "Very happy to see you again. If you open a company in Hefei, [we] can see you more often, Wu Yaokun also came to Hefei to work." My Qiu replied: "Regarding the company, this time back to meet with two investors, if the funds can be put in place, want to start running on both sides next year, three years to return home to settle. I'd like to share with you the direction I'm doing and discuss the pros and cons of staring a company in Hefei."

48.     The business trip Mr. Qiu mentioned in his email to Mr. Qing on September 5, 2010 was a Concepts business trip paid for by Concepts in order that Mr. Qiu could present a technical paper he had co-authored with other Concepts employees entitled "An Integrated Design System for Turbomachinery." Some of the ideas in and the title of the paper later became incorporated into TurboTides. The word TIDES in the name "TurboTides" is an acronym for <u>T</u>urbomachinery <u>I</u>ntegrated <u>DE</u>sign <u>S</u>ystem.

49.     On information and belief, Mr. Qiu returned to the United States from his meeting in Hefei with investors and began to implement his plan to set up his TurboTides business that

13

would be "running on both sides" in Hefei, China and the United States while simultaneously working at Concepts.

     50.     Ms. Zhang is a software engineer with expertise in turbomachinery.

     51.     On information and belief, Mr. Qiu shared his business plan to set up businesses in both the United States and in China with his wife Defendant Zhang and, together, while Mr. Qiu was still an employee of CETI, on November 3, 2011, Zhang and Qiu formed and registered TurboTides LLC in New Hampshire with a principal place of business at their home at 21 Pinneo Hill Road, Hanover NH.  In its filing with the New Hampshire Secretary of State, signed by Ms. Zhang as "manager" on behalf of TurboTides LLC, it's stated principal purpose was "software development."  Defendants Qiu's, Zhang's and TurboTides' "software development" business concerned the development of turbomachinery software.

     52.     Under the direction of Qiu as its chief architect and according to an email authored by Qiu, "In 2012 an international team of experts in the field began to develop TurboTides."

     53.     On numerous occasions between July, 2012 and December, 2014, Mr. Qiu obtained information from his friends Yu Qing and Pinhua Xie about how to apply for the benefits of a program called the "1000 Person Plan" sponsored by the Chinese Ministry designed to induce Chinese born entrepreneurs back to China from countries like the United States by offering inducements to applicants such as "prize" money, low interest loans, housing, leases on industrial space and other attractive benefits for new technology based businesses.

     54.     On information and belief, through the Chinese office of TurboTides operating as one or more of the Hefei Entities or another entity he set up in China, Mr. Qiu applied to the Chinese Ministry's "1000 Person Plan" for benefits for TurboTides in China.

14

55.     As a result of its application to the Chinese Ministry's 1000 Person Plan and/or other similar programs offered by Chinese government entities, TurboTides won First Place in the Chinese Competition and was awarded a substantial sum of money to be used for TurboTide's business.

56.     Each year, from 2012 through 2017, while developing TurboTides with a team of international experts, Mr. Qiu and Ms. Zhang operated TurboTides LLC and, Ms. Zhang filed Annual Reports with the New Hampshire Secretary of State as its Manager.

57.     Although there is no trace of his name on the New Hampshire Secretary of State's records regarding TurboTides LLC, Mr. Qiu signed a letter on December 23, 2017 as the "Founder and President, TurboTides LLC." On information and belief, Mr. Qiu concealed his role as "Founder and President" of TurboTides LLC prior to leaving the employment of Concepts on December 7, 2015 and arranged with Ms. Zhang to sign any publicly available documents filed with the New Hampshire Secretary of State in order to avoid Concepts' detection of his role.

58.     Ms. Zhang's brother is the office manager of Hefei Taize.

59.     In January and February, 2015, almost a year before leaving the employment of CETI, Mr. Qiu used a personal "gmail" account on behalf of an entity in China to solicit hundreds of thousands of dollars in engineering services from a turbomachinery company in Thetford, Vermont named Turbo Solutions Engineering, LLC ("TurboSolutions") to design a Liquid Natural Gas pump for the Chinese entity. At the time, Qiu was aware that TurboSolutions was a competitor of Concepts for the same kind of engineering services. Mr. Qiu did not advise Concepts of his work for the Chinese entity or provide Concepts with the opportunity he offered to TurboSolutions. On information and belief, Mr. Qiu's work for the

Chinese entity was for his benefit. The opportunity Mr. Qiu made available to TurboSolutions established a foundation for further work between TurboTides and TurboSolutions that continues to the present time.

60.     On or about the period from June 14-21, 2015 and while Mr. Qiu was still employed by CETI, through their agent and a former employee of the Plaintiff named Wayne Simpson, Defendants contacted Ted Gresh of Flexware, Inc. and proposed that TurboTides would license from Flexware, Inc. certain turbomachinery software that Defendants wished to incorporate into the TurboTides' software. This resulted in a meeting between Mr. Simpson, Mr. Gresh and another agent of the Defendants named Xufeng Zhang and a note from Mr. Simpson expressing interest about working with their "new organization."

61.     On June 29, 2015, before Mr. Qiu left the employment of CETI, through an entity in China named Hefei Taize Toping Technology Co. Ltd. and with the help of Mr. Qiu's friend, Pinhua Xie, Defendants registered the domain name "turbotides.com.cn." Defendant Qiu uses email addresses at "turbotides.com.cn" and "turbotides.com" alternatively and without distinction to carry on the business of TurboTides in both the United States and in China.

62.     Mr. Qiu and Ms. Zhang formally changed the name and corporate form of TurboTides LLC to Defendant TurboTides, Inc. on or about May 2, 2018. Other than the name and corporate form change, there is and was no difference between the two entities. Even after changing the corporate form from "LLC" to "Inc" and purportedly dissolving TurboTides LLC, Ms. Zhang and Mr. Qiu both signed documents with the United States Patent and Trademark Office on behalf of TurboTides LLC to complete the registration of the mark.

The Wrongful Taking Of Concepts' Software Trade Secrets, Concepts Copyrighted
Trade Secrets And Concepts' Non-Software Trade Secrets

63.     Unknown to CETI and Concepts, with Ms. Zhang's help, Qiu conceived of and then founded TurboTides LLC during the time he was working for CETI under cover and surreptitiously for the purpose of developing and, while employed by CETI, did develop turbomachinery software (the "TurboTides Software") based, in whole or in part, upon his knowledge of the Concepts Software Trade Secrets, the Concepts Copyrighted Trade Secrets and the Concepts Non-Software Trade Secrets in order to eventually compete in the turbomachinery business field with and against Concepts.

64.     Qiu claims to be and is the chief architect of the TurboTides Software.

65.     Upon information and belief, during the time he was an employee of CETI but on behalf and in the interests of himself and TurboTides, Mr. Qiu individually and as an agent, employee, principal and or/co-conspirator with and of TurboTides LLC and Ms. Zhang, and without notice to or permission from CETI or Concepts, improperly became knowledgeable about, reviewed, absorbed, recorded, learned, accessed, downloaded, scraped, and/or copied (collectively "Wrongfully Obtained") portions and/or all of versions of the Concepts Software and its code for his personal use and the use of TurboTides LLC.

66.     Upon information and belief, during the time he was an employee of CETI and Concepts but on behalf of himself and TurboTides LLC and in furtherance of his conspiracy with Ms. Zhang, Mr. Qiu Wrongfully Obtained all or some of the Concepts Software, including Concepts Copyrighted Trade Secrets, on physical media such as thumb drives, computer hard drives, computer discs and/or notebooks and paper.

67.     Upon information and belief including, Mr. Qiu's written admission, information in press releases issued by one or more of The TurboTides Entities and statements made by Qiu to employees of CN Holdings, Inc. and Concepts, some of the Wrongfully Obtained Concepts

17

Software and code now possessed by Mr. Qiu on physical media, including alternative meanline modeling and a Turbomachinery Integrated Design System, was authored by Mr. Qiu while an employee of CETI and, pursuant to the Employment Agreement, is the property of CETI but was never deposited or shared with CETI or Concepts (the "Non-Shared Qiu Software").

68.     The Non-Shared Qiu Software is a subset of Concepts Software Trade Secrets.

69.     By leaving CETI without relinquishing possession of the Non-Shared Qiu Software recorded on physical media, Qiu and TurboTides LLC deprived CETI and Concepts of possession and use of the Non-Shared Qiu Software.

70.     Upon information and belief, during the time he was an employee of CETI but on behalf and in the interests of himself and The TurboTides Entities, Mr. Qiu individually and as an agent, employee, principal and or/co-conspirator with and of The TurboTides Entities and Ms. Zhang, and without notice to or permission from CETI or Concepts, Wrongfully Obtained Concepts Non-Software Trade Secrets for his personal use and the use of The TurboTides Entities.

71.     Other than for the benefit and use of CETI, Mr. Qiu had no right at any time while employed by CETI or thereafter to ever record, author, collect, possess, take or use in any way for his personal benefit or the benefit of The TurboTides Entities any developments of Concepts, including  the Concepts Software and/or Concepts Copyrighted Trade Secrets and/or Concepts Non-Software Trade Secrets, including that contained on physical media.

72.     Other than for the benefit and use of CETI, Mr. Qiu had no right at any time while employed by CETI or thereafter to ever possess, take or use in any way for his personal benefit or the benefit of the TurboTides Entities any of the "Non-Shared Qiu Software", including that contained on physical media.

18

73.     Pursuant to the Employment Agreement, General Agreement Paragraph 6, Mr.
Qiu had the opportunity at the time of his initial employment at CETI to list "any existing work
or work in progress" in which he claimed an ownership right and which is related to CETI's
"business, business plans, or research and development efforts." Since Mr. Qiu listed no existing
work or work in progress, he began employment without any such existing work or work in
progress.

74.     Absent his employment by CETI and work for Concepts, Mr. Qiu would not have
had access to Concepts Software Trade Secrets, Concepts Copyrighted Trade Secrets or
Concepts Non-Software Trade Secrets.

75.     Because Mr. Qiu began his employment with CETI without little experience in
the turbomachinery field and no existing work or work in progress related to Concepts' or
CETI's business, business plans, or research and development efforts, all of Mr. Qiu's work in
the turbomachinery field for his personal benefit and/or the benefit of The Turbo Tides Entities
and/or the benefit of CETI and Concepts while employed by CETI for over 14 years and
thereafter any work he and The TurboTides Entities developed that was derived from Concepts
Non-Software Trade Secrets, Concepts Software Trade Secrets or Concepts Copyrighted Trade
Secrets is the property of Concepts.

76.     Upon information and belief and especially in light of the fact that The
TurboTides Entities began business and a "team of international experts began to develop
TurboTides" under Mr. Qiu's direction while Qiu was an employee of CETI and then quickly
after he left Concepts publicly made available and registered in China a complicated and
sophisticated turbomachinery software code, Qiu's understanding and conception of the
operating systems, features and code for TurboTides' Software and The TurboTides Entities'

19

business model and operations were derived from and were not wholly independent of information Qiu Wrongfully Obtained from Concepts Software Trade Secrets, Concepts Non-Software Trade Secrets and Concepts Copyrighted Trade Secrets over his fourteen years of employment by CETI and work at Concepts.

77.     According to The TurboTides Entities' website on its "About Us" page, "[t]he key technology and basic source code of TurboTides originated from the accumulation of decades of core team in the United States. After many years of preparation, in 2016, with the help of the Hefei Municipal Government [in China] he [Qiu] went to the China University of Science and Technology Association Industrial Park and registered the copyright of its core product TurboTides in China, with complete source code."

78.     Upon information and belief, including The TurboTides Entities' own press releases and Qiu's relative lack of knowledge of turbomachinery technology and source code before he joined CETI in 2001, the referenced "accumulation of decades of core team in the United States" is a reference to the wrongful accumulation by Qiu of CETI's and Concepts' decades of technology and source code for turbomachinery.

79.     Given the complexity of turbomachinery software and the brief time between the termination of Mr. Qiu's employment by CETI on December 7, 2015 and the announced registration of the TurboTides' Software copyright in China, with "complete source code" a very short time later sometime in 2016, the TurboTides turbomachinery software was not and could not have been authored by Qiu and The TurboTides without the substantial contribution of trade secret information Defendant Qiu Wrongfully Obtained from CETI and Concepts.

80.     The TurboTides turbomachinery software was created based upon information Mr. Qiu Wrongfully Obtained from Concepts Software Trade Secrets, Concepts Non-Software

Trade Secrets and Concepts Copyrighted Trade Secrets over his fourteen years of employment by CETI and work at and for Concepts.

<u>Defendants' Wrongful Use Of Concepts' Copyrighted Trade Secrets, Software Trade Secrets And Non-Software Trade Secrets</u>

81.     Upon information and belief, using some or all of the Concepts' Software and/or Concepts' Software Trade Secrets and/or Non-Software Trade Secrets they Wrongfully Obtained from CETI and Concepts, Defendants Qiu and TurboTides wrongfully conceived of and/or developed one or more derivative works that comprise the TurboTides Software that they have marketed and sold and now market and sell to compete with Concepts.

82.     Upon information and belief, Defendant Qiu and TurboTides conceived of and developed all or a portion of the TurboTides business strategies and business methods of operation from Wrongfully Obtained Concepts' Software Trade Secrets and Concepts' Non-Software Trade Secret information.

83.     Upon information and belief, for the purpose of competing with Concepts and obtaining access to Concepts' Non-Software Trade Secrets concerning business objectives, pricing, sales, customers, and potential customers, Defendant Qiu and TurboTides hired former employees of CETI who worked at Concepts in key sales and other positions.

84.     One of the former CETI employees that TurboTides hired is Scott Hanratty who worked at CETI and Concepts from 2007 to 2010 and then from January 2015 to October 2018, overlapping Mr. Qiu's time at CETI and Concepts and the period Mr. Qiu was surreptitiously building TurboTides to wrongfully compete with Concepts.  Mr. Hanratty was Concepts' regional sales director for the Americas and East Asia and in charge of sales of advanced engineering software.  While at Concepts, Mr. Hanratty managed all sales activities for North &

South America and East Asia and was responsible for well over 50% of Concepts' global sales quota plan on an annual basis.

85.     While at Concepts, Mr. Hanratty's core competencies included Global Channel Management, Direct sales and mentoring, Forecast and Pipeline Management, Territory and Market Development, Strategic Planning and Implementation, P&L Accountability, Global Team Management & Expansion, Complex Sales Cycles, Enterprise Consultative Selling, Strategic OEM Partnerships and International Culture, Economies and Political climates.

86.     Another former CETI employee that TurboTides hired is Alec (Hui) Li who was Managing Director of CN Holdings, Inc. and General Manager of Sales in Asia. Mr. Li worked at Concepts from April, 2015 to August 2019, overlapping Mr. Qiu's time at Concepts and the period Mr. Qiu was surreptitiously building TurboTides to wrongfully compete with Concepts. As such, Mr. Li is knowledgeable about Concepts Non-Software Trade Secrets in the areas of Finance, Technical Support and Sales. Mr. Li now serves as TurboTides' Vice President of Sales.

87.     Another one of the former CETI's employees that TurboTides hired is Scott Thibault who was a Concepts' salesman. Mr. Thibault is knowledgeable about Concepts Non-Software Trade Secrets in Sales.

88.     Upon information and belief, Mr. Qiu and TurboTides were aware that the employees of CETI that joined TurboTides, including Mr. Hanratty, Mr. Thibault and Alec (Hui) Li, had signed employment agreements with CETI that include provisions like those found in the Employment Agreement designed to protect Concepts' Non-Software and Software Trade Secrets but, nevertheless hired them to supplement the information Defendant Qiu Wrongfully Obtained from Concepts and to extract from them additional Concepts' Software Trade Secrets

and Non-Software Trade Secrets, especially concerning sales information, from those employees
for the benefit of Qiu and TurboTides.

89.     Based in whole or in part on Concepts' Software Trade Secrets, Concepts' Non-
Software Trade Secrets, Concepts' Copyrighted Trade Secrets that was Wrongfully Obtained
from Concepts and confidential information from CETI employees it hired from CETI ,
TurboTides now advertises and claims to be an "international company" offering
"groundbreaking technologies and complete solutions for turbomachinery design" including
"sales, technical support, training and engineering consulting services for TurboTides customers
worldwide."

90.     But for Concepts' Software Trade Secrets, Concepts' Non-Software Trade
Secrets, Concepts' Copyrighted Trade Secrets that was Wrongfully Obtained from Concepts'
and confidential information from CETI employees it hired, TurboTides would not be able to
advertise and claim to be an "international company" offering "groundbreaking technologies and
complete solutions for turbomachinery design" including "sales, technical support, training and
engineering consulting services for TurboTides customers worldwide."

### The Pirated Concepts' Software

91.     On information and belief, Mr. Qiu and/or TurboTides obtained or purchased an
illegally pirated copy of the Concepts' Software in which was imbedded a tracking device.

92.     Through the tracking device, Concepts was alerted to the fact that someone was
using a computer to access and operate the Concepts' Software in the pirated copy.

93.     Through the tracking device, Concepts located a computer using the pirated
Concepts' Software between April 5, 2020 and May 25, 2020 at a physical location in Hefei

23

City, China, which on information and belief, is an office or facility used and operated by The TurboTides Entities.

94.     On information and belief, the computer that was accessing and using the pirated Concepts' Software was a computer registered to and/or owned by The TurboTides Entities.

95.     Upon information and belief, at the direction of or with the knowledge of Defendant Qiu, The TurboTides Entities wrongfully obtained and accessed the pirated Concepts' Software for the purpose of surreptitiously obtaining confidential Trade Secret information about the Concepts' Software and/or reverse engineering the Concepts' Software for a wrongful commercial purpose, profit, and competitive advantage.

## CLAIMS FOR RELIEF

### I. FIRST CLAIM FOR RELIEF
(Defendants' Liability For Breach Of Employment Contract As Qiu's Alter Ego And/Or Agent)

96.     Concepts incorporates the allegations and averments of paragraphs 1 through 95 above as though fully set forth in this paragraph.

97.     On information and belief, Defendants were created by or at the direction of Xuwen Qiu and Qiu controls and directs Defendants. Thus, Defendants are aware of Qiu's knowledge relating to Qiu's Employment Agreement with Concepts and, armed with that knowledge, operate at Qiu's direction as Qiu's alter ego and/or agent.

98.     The Employment Agreement defines CETI's "Confidential Technology and Information." CETI's Confidential Technology and Information is one and the same as Concepts' Confidential Technology and Information and Qiu knew this fact while employed by CETI and working for Concepts.

24

99.     Pursuant to the Employment Agreement, Qiu agreed that CETI is the owner of all Confidential Technology and Information as defined in the Employment Agreement and that he would not make claim to, use or disclose the Confidential Technology and Information except in accordance with the terms of the Employment Agreement.

100.    Qiu breached the Employment Agreement when he made claim to, used and disclosed to The TurboTides Entities and their employees and third parties the Confidential Technology and Information.

101.    Pursuant to General Agreement Paragraph 2 of the Employment Agreement, Mr. Qiu agreed that

> "any and all Confidential Technology and Information, whether now known by you or CETI, including any ideas, inventions, discoveries, developments, or improvements made or discovered by you or other CETI employees during your or their employment at CETI, was and will be obtained at the expense and for the benefit of CETI.  Except as may be required by your employment at CETI, you will not, without CETI's written consent, disclose or use, nor solicit nor assist another to use or disclose, at any time either during or subsequent to your employment by CETI, any Confidential Technology and Information of CETI."

102.    Qiu breached General Agreement Paragraph 2 when he disclosed and used CETI's and Concepts' Confidential Technology and Information to write, develop, market and sell the TurboTides' Software.

103.    Qiu breached General Agreement Paragraph 2 when he disclosed and used CETI's and Concepts' Confidential Technology and Information to create and then operate The TurboTides Entities to compete with Concepts.

104.    Upon information and belief, Qiu breached General Agreement Paragraph 2 when he gleaned information from and assisted Mr. Hanratty, Mr. Thibault and Mr. Li to use and disclose CETI's and Concepts' Confidential Technology and Information to compete with Concepts.

105.    Pursuant to General Agreement Paragraph 3 of the Employment Agreement, Mr. Qiu agreed to promptly disclose to CETI "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by you during the period of employment and related to the business or activities of CETI.  You will assign and hereby agree to assign all your interests therein to CETI or its nominee."

106.    Qiu breached General Agreement Paragraph 3 when he failed to promptly disclose to CETI and Concepts "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by [him] during the period of employment" that are now incorporated into the TurboTides' Software and/or The TurboTides Entities' business.

107.    Qiu breached General Agreement Paragraph 3's requirement that he assign his interests in TurboTides' Software and The TurboTides Entities' business to CETI and/or Concepts.

108.    Pursuant to General Agreement Paragraph 4 of the Employment Agreement, Mr. Qiu agreed "that any computer software and documentation made by you during the period of your employment and related to the business, operation, or activities of CETI shall be considered 'works made for hire' under the copyright laws of the United States" and "to execute any assignments or other documents reasonably deemed necessary by CETI to vest exclusive ownership in CETI for its sole benefit."

109.    Qiu breached General Agreement Paragraph 4's requirement that he assign his interests in TurboTides' Software and documentation of the business, operation or activities of The TurboTides Entities to CETI and/or Concepts.

110.    As a direct and proximate result of Qiu's breaches of his Employment Agreement with CETI, Concepts has suffered and will continue to suffer, damages in an amount to be proved at trial.

111.    To the extent Qiu is liable to Concepts for breaches of the Employment Agreement, Defendants are also liable to Concepts for Qiu's wrongdoing as Qiu's alter ego and/or agent.

112.    Pursuant to the terms of the Employment Agreement, Concepts is the legal owner of all rights and interest in the TurboTides' Software and The TurboTides Entities' business and any profits and awards derived from it.

## II. SECOND CLAIM FOR RELIEF
### (Defendants' Liability For Copyright Infringement In Violation Of 17 U.S.C. § 101, et seq.)

113.    Concepts incorporates the allegations and averments of paragraphs 1 through 112 above as though fully set forth in this paragraph.

114.    The Concepts' Software constitutes copyrightable subject matter under to 17 U.S.C. § 101, et seq. (the "Copyright Act").

115.    Concepts is the owner of all right, title and interest in and to the copyrights in the Concepts Software.

116.    Qiu and the TurboTides Entities accessed the Concepts' Software both by using a pirated copy of the Concepts' Software and, on information and belief, wrongfully copying the Concepts' Software while and after Defendant Qiu was employed by CETI and working at Concepts.

117.    Qiu and the TurboTides Entities were aware that Concepts owned the Concepts' Software and all copyrightable material therein.

118.     On information and belief, Qiu and The TurboTides Entities copied and distributed copies of all or parts of the Concepts' Software, prepared one or more derivative works based upon the Concepts' Software, distributed copies of such derivative works, and/or otherwise used all or parts of the Concepts' Software in violation of 17 U.S.C. § 501 of the Copyright Act.

119.     Except for Qiu's work for the exclusive benefit of CETI and Concepts, Concepts has never authorized, licensed, or otherwise permitted him or The TurboTides Entities to use, copy, scrape, create derivative works based on, or distribute any part of the Concepts' Software.

120.     Qiu and The TurboTides Entities unauthorized copying, scraping, distribution, and use of the Concepts' Software, and their creation of derivative works based on the Concepts Software, constitutes copyright infringement under the Copyright Act.

121.     The foregoing activities undertaken by the Qiu and The TurboTides Entities were willful.

122.     Upon information and belief, unless enjoined by this Court, Qiu and The TurboTides Entities will continue infringing upon and otherwise profiting from their unauthorized use of the Concepts' Software.

123.     Qiu and The TurboTides Entities conduct has caused and will continue to cause irreparable injury and damage to Concepts for which Concepts is entitled to damages and injunctive relief.

III. THIRD CLAIM FOR RELIEF
(Defendants' Liability For Misappropriation of Trade Secrets Under 9 V.S.A. § 4601, et. seq.)

124.     Concepts incorporates the allegations and averments of paragraphs 1 through 123 above as though fully set forth in this paragraph.

28

125. The Concepts' Copyrighted Trade Secrets, Software Trade Secrets and Non-Software Trade Secrets constitute trade secrets under 9 V.S.A. § 4601, as they contain and comprise information, designs, and processes that derive independent economic value from not being generally known to or readily available by proper means to unauthorized users who can obtain economic value from their disclosure.

126. Reasonable efforts are undertaken by Concepts to maintain the secrecy of all of its Trade Secrets by limiting access only to third-parties who agree to licensing Terms and Conditions designed to preserve confidentiality and by requiring employees and contractors to execute agreements like the Employment Agreement that are designed to preserve confidentiality.

127. Concepts has invested substantial amounts of money and resources in the development of its Trade Secrets to protect and further its business interests. The Trade Secrets are of great commercial importance to Concepts and are of great independent economic value to its competitors, such as The TurboTides Entities.

128. The Concepts Trade Secrets are valuable confidential and proprietary property that is not generally known or readily ascertainable by proper means by competitors of Concepts or others.

129. The TurboTides Entities misappropriated Concepts' Trade Secrets by acquiring and using them through a pirated copy of the Software, violating the Terms and Conditions, extracting them from former CETI and Concepts employees and by obtaining and using the Trade Secrets through the means of information developed and collected by Qiu during his employment with CETI and while working at Concepts.

29

130.    The TurboTides Entities each knew or had reason to know that they were improperly acquiring and using Concepts' Trade Secrets.

131.    Upon information and belief, unless enjoined by this Court, the TurboTides Entities will continue profiting from their misappropriation of Concepts' Trade Secrets.

132.    The TurboTides Entities' conduct has caused and will continue to cause irreparable injury to Concepts' business, reputation, and goodwill unless restrained by this Court. As such, Concepts has no adequate remedy at law and is entitled to injunctive relief pursuant to 9 V.S.A. § 4602.

133.    The TurboTides Entities conduct is in violation of Vermont's Trade Secrets law, 9 V.S.A. § 4601, et seq.

134.    Concepts is entitled to damages pursuant to 9 V.S.A. § 4603, including but not limited to its damages for loss of its Trade Secrets and attorneys' fees.

135.    Concepts is further entitled to punitive damages because the TurboTides Entities improperly misappropriated Concepts' Trade Secrets knowingly and maliciously.

## IV. FOURTH CLAIM FOR RELIEF
(Unjust Enrichment)

136.    Concepts incorporates the allegations and averments of paragraphs 1 through 135 above as though fully set forth in this paragraph.

137.    By their unlawful actions at the expense of Concepts, The TurboTides Entities knowingly obtained business-related benefits from Concepts to which they were not entitled in the form of Concepts' Non-Software Trade Secrets and Software Trade Secrets.

138.     The TurboTides Entities' knowing acquisition of these benefits occurred under
circumstances that render it inequitable for The TurboTides Entities to retain the benefits without
paying for their value.

139.     As a result of The TurboTides Entities' unjust enrichment and excluding the
Copyrighted Trade Secrets that are the subject of and preempted by Plaintiff's Copyright Claim,
The TurboTides Entities should be ordered to compensate Concepts for the value of the
information it unwillingly provided and ordered to disgorge all profits derived using the
information.

## V.  FIFTH CLAIM FOR RELIEF
(Unfair and Deceptive Trade Practices Under Vermont's Consumer Protection Act, 9
V.S.A. § 2453)

140.     Concepts incorporates the allegations and averments of paragraphs 1 through 139
above as though fully set forth in this paragraph.

141.     Excluding Copyrighted Trade Secrets that are the subject of and preempted by
Plaintiff's Copyright Claim, The TurboTides Entities' wrongful access to and use of the
Concepts Non-Software Trade Secrets and Software Trade Secrets in order to establish and
operate their business and to compete with Concepts was an unfair and deceptive act or practice
under Vermont's Consumer Protection Act, 9 V.S.A. § 2453.

142.     Concepts sustained damages as a result of The TurboTides Entities' unfair and
deceptive practices prohibited by Section 2453.

143.     The TurboTides Entities engaged in unfair trade practices in commerce in
violation of the Vermont Consumer Protection Act, 9 V.S.A. § 2453(a).

144.     In violating Vermont's Consumer Protection Act, Spinpo committed a tort.

31

145.    On information and belief, the Doe 1-10 owner or owners of Spinpo participated in the commission of the tort.

146.    The Doe 1-10 owner or owners are liable for the tort.

147.    The TurboTides Entities' unfair and deceptive practices were material.

148.    Concepts sustained damages as a direct result of The TurboTides Entities' unfair, and deceptive actions and as a result are entitled to all remedies set forth in 9 V.S.A. § 2461(b), including attorneys' fees and exemplary damages in the amount of treble compensatory damages.

## VI. SIXTH CLAIM FOR RELIEF
(Tortious Interference with Business Relations and Prospective Economic Advantage)

149.    Concepts incorporates the allegations and averments of paragraphs 1 through 148 above as though fully set forth in this paragraph.

150.    At all relevant times, Concepts has enjoyed beneficial relationships with its customers and prospective customers and has gained and stood to gain economic advantage from said relationships.

151.    At all relevant times, The TurboTides Entities have been aware of Concepts' business relationships with its customers and prospective customers.

152.    On information and belief and with knowledge of Concepts' business relationships and reputation with customers and prospective customers, The TurboTides Entities have intentionally, tortiously, and unjustifiably interfered with said relationships by hiring former CETI and/or Concepts employees who have confidential information about Concepts' business, its customers, its potential customers, its pricing models, its long term objectives, its operations, and its pricing to join The TurboTides Entities and share that confidential information with The TurboTides Entities.

32

153.    Upon information and belief and excluding Copyrighted Trade Secrets, The
TurboTides Entities have used and will continue to use Non-Software Trade Secrets, Software
Trade Secrets, and confidential information gleaned from former CETI and Concepts employees
concerning identity of customers and potential customers, pricing and business plans to
approach, advertise to and attempt to induce Concepts' customers and potential customers to do
business with The TurboTides Entities.

154.    Concepts has no adequate remedy at law to compel The TurboTides Entities to
cease their wrongful acts and will continue to suffer irreparable harm if The TurboTides Entities'
actions are not enjoined.  Concepts' damages are irreparable because it is extremely difficult to
ascertain the amount of compensation that would afford Concepts adequate relief if The
TurboTides Entities are not enjoined at this time.

155.    Concepts is entitled to injunctive relief in the form of a preliminary injunction
and/or a permanent injunction prohibiting The TurboTides Entities from tortiously interfering
with Concepts' business relations and prospective economic advantage by using, with the
exclusion of Copyrighted Trade Secrets that are the subject of and preempted by Plaintiffs'
Copyright Claim, Concepts' Non-Software Trade Secrets, Concepts' Software Trade Secrets,
and confidential information gleaned from former Concepts employees.

156.    Concepts is entitled to recover from The TurboTides Entities all damages that
Concepts has sustained and will sustain as a result of The TurboTides Entities unlawful conduct
and all gains, profits and advantages obtained by The TurboTides Entities as a result thereof.

157.    Spinpo tortiously interfered with Concepts' business relations and prospective
economic advantage.

158.     On information and belief, the Doe 1-10 owner or owners of Spinpo participated in the commission of the tort.

159.     The Doe 1-10 owner or owners are liable for the tort.

160.     The exceptional circumstances of this case involving The TurboTides Entities' intentional, malicious, willful, wanton, and unlawful conduct, as well as The TurboTides Entities' reckless indifference to Concepts' rights, entitle Concepts to an award of punitive damages.

## VII. SEVENTH CLAIM FOR RELIEF
(Constructive Fraud)

161.     Concepts incorporates the allegations and averments of paragraphs 1 through 160 above as though fully set forth in this paragraph.

162.     The Turbo Tides Entities' fraudulent concealment of the surreptitious creation of Spinpo from Concepts and this Court  comprised a constructive fraud because Defendants were in a position of superior knowledge relative to Concepts and the Court about the reasons for creation of Spinpo and, thereby, intentionally gained an unfair advantage over Concepts and the Court at the expense of Concepts and the Court.

163.     On information and belief, the Doe 1-10 owner or owners of Spinpo participated in the commission of the fraud.

164.     The Doe 1-10 owner or owners are liable for the fraud.

165.     Concepts was damaged by Defendants' constructive fraud.

## VIII. EIGHTH CLAIM FOR RELIEF
(Civil Conspiracy)

166.     Concepts incorporates the allegations and averments of paragraphs 1 through 165 above as though fully set forth in this paragraph.

167.     Upon information and belief, as co-conspirators, Defendants and the other members of The TurboTides Entities agreed and conspired together as part of a common design or plan to use unlawful means to set up the Spinpo business using Concept's trade secrets to compete with Concepts in the turbomachinery software business.

168.     Upon information and belief, the unlawful means utilized by the co-conspirators is comprised of knowingly collaborating to facilitate Qiu's violation of the Qiu Employment Agreement, engaging in copyright infringement, misappropriating trade secrets, unjustly enriching themselves at Concepts' expense, violating Vermont's Consumer Protection Act, tortiously interfering with Concepts' business relations and prospective economic advantage, and engaging in constructive fraud all as alleged in the foregoing claims.

169.     As a result of the foregoing civil conspiracy by Defendants with the other members of The TurboTides Entities, Concepts was damaged.

170.     On information and belief, the Doe 1-10 owner or owners of Spinpo participated in the civil conspiracy.

171.     The Doe 1-10 owner or owners are liable for the civil conspiracy.

172.     Defendants' participation in the civil conspiracy was malevolent, purposeful, malicious, reckless, willful and/or in bad faith.

## PRAYER FOR RELIEF

Concepts prays for entry of judgment in its favor and against Defendants as follows:

1.     A finding that Defendants have been unjustly enriched to the damage of Concepts;

2.     A finding that the actions of Defendants are malicious, reckless, willful and/or in bad faith;

3.     A temporary, preliminary and permanent injunction enjoining and restraining Defendants, and all of their agents, successors and assigns, and all persons in active concert or participation with any of them, from using, or directing, aiding, or conspiring with others to use Concepts' Software and Trade Secrets, in any manner, directly or indirectly;

4.     A temporary, preliminary and permanent injunction ordering Defendants to destroy any and all copies of any documents that contain Concepts' Trade Secrets, the Software and any derivative material created from them, that is in the possession of Defendant, its agents, successors and assigns, and all persons in active concert of participation with any of them;

5.     A temporary, preliminary and permanent injunction enjoining Defendants their agents and/or principals, successors and assigns, and all persons in active concert of participation with any of them from using any of Concepts' Trade Secrets and/or Software in any products created by Defendants and/or Defendants' business;

6.     An order requiring Defendants to each file with this Court and serve upon Concepts within thirty (30) days after the entry of the permanent injunction, a report, in writing and under oath, setting forth in detail the manner and form in which it has complied with the injunction;

36

7.      An award to Concepts of all statutory damages, compensatory damages, actual damages, punitive damages, profits, and/or restitution to which it is entitled, in amounts to be proven at trial, caused by Defendants' Unjust Enrichment, Breach of Contract, Misappropriation Of Trade Secrets, Violation of Vermont's Consumer Protection Act, Tortious Interference With Business Relations and Prospective Economic Advantage, Copyright Infringement, Constructive Fraud and Civil Conspiracy.

8.      An order that all of Defendants' interests in The TurboTides Entities, including its profits, awards, and the TurboTides' Software are and shall be the property of Concepts;

9.      An award to Concepts of its costs and attorneys' fees and expenses; and

10.     All such other and further relief as the Court shall deem just.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury.

November 8, 2023

FAWLEY PLLC

By

R. Bradford Fawley
680 E. Main Street #596
Stamford, Connecticut   06901
Telephone: 802-380-4735
fawleybrad@gmail.com
ATTORNEY FOR PLAINTIFF